IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFERY JURY, | ) | CASE NO. 1:12-cv-01346 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION,[1] | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Jeffery Jury ("Plaintiff" or "Jury") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 15.  As discussed below, the Administrative Law Judge ("ALJ") failed to provide a Step Three analysis sufficient to permit the Court to assess whether the ALJ's determination that Jury's impairments failed to meet or equal a Listing[2] was supported by substantial evidence. Accordingly, the Court **REVERSES** the Commissioner's decision and **REMANDS** this case for further proceedings consistent with this Opinion.

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FED. R. CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

[2] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

## I.  Procedural History

Jury filed an application for Disability Insurance Benefits ("DIB") on or about July 27, 2007.  Tr. 58-59, 81-86.  Jury alleged a disability onset date of August 15, 2002 (Tr. 83), and alleged disability based on herniated cervical discs, high blood pressure, difficulty hearing, liver and abdominal pain (Tr. 58-59, 60, 64, 68, 102, 110).  After initial denial by the state agency (Tr. 60-66) and denial upon reconsideration (Tr. 68-74), Jury requested a hearing (Tr. 75-76).  On September 22, 2010, ALJ Kurt G. Ehrman conducted an administrative hearing.  Tr. 29-57.

In his September 29, 2010, decision (Tr. 11-28), the ALJ determined that Jury had not been under a disability at any time from August 15, 2002, the alleged onset date, through December 31, 2005, the date last insured.  Tr. 24.  Jury requested review of the ALJ's decision by the Appeals Council.  Tr. 9-10.  On April 18, 2012, the Appeals Council denied Jury's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.  Personal and Vocational Evidence

Jury was born on January 27, 1964.  Tr. 83.  His educational background includes a GED with vocational training as a machinist.  Tr. 50, 107.  At the time of the hearing, Jury had last worked on August 15, 2002, as a welder, pipe fitter, and laborer.  Tr. 35-36.  At the time of the hearing, Jury was living with his fiancé in the bottom half of a duplex home.  Tr. 42.

### B.  Medical Evidence[3]

#### 1.  Treatment records

---

[3] Jury does not challenge the ALJ's findings relative to his mental impairments.  Accordingly, the medical evidence discussed herein relates primarily to his physical impairments.

On August 15, 2002, Jury suffered an accident at work.  Tr. 36, 271, 425.  While carrying wood, Jury attempted to get out of the way of a backhoe and fell and ruptured his right biceps tendon.[4]  Tr. 36-37, 271.  On August 27, 2002, Jury had surgery to repair his biceps rupture.  Tr. 425.  Jury indicated that, since the biceps tendon tear, he has experienced pain in his arm and in his neck.  Tr. 37.  On October 17, 2002, November 14, 2002, and December 19, 2002, examinations revealed that Jury's gait was normal, his reflexes were normal and symmetric, and his sensation was grossly intact.  Tr. 404-05, 410-11, 416-17.

On January 30, 2003, Jury reported to his physical therapist that he had right forearm pain and tenderness in his right forearm with sharp pain occurring primarily with usage of his arms and worsening with any type of lifting.  Tr. 424-25.  He reported difficulty with snow shoveling and other household activities.  Tr. 425.  A right shoulder examination revealed abnormalities in Jury's biceps strength, triceps strength, Speed's test, pain to forearm medially and laterally, and decreased girth grossly on right biceps/triceps versus the left.  Tr. 430-31. Jury's physical therapist assessed Jury as having pain, decreased strength, decreased function, postural deviation, lack of home exercise program, and poor body mechanics.  Tr. 426.  Jury's short term goal was to become independent with a home exercise program and his long term goals were to increase strength, improve ability to perform daily living activities, initiate job training as part of vocational rehab, decrease pain, become independent with a home exercise program, and initiate work conditioning.  Tr. 426.  Jury was instructed to begin a physical therapy plan which included three sessions per week for six weeks.  Tr. 426.

On February 3, 2003, prior to performing exercises during his second physical therapy visit, Jury reported a pain level of zero on a scale of zero to ten.  Tr. 433-34.  He reported having difficulty performing his daily living activities.  Tr. 434.  Jury was tolerating treatment well, not

---

[4] A worker's compensation claim was pending at the time of the administrative hearing.  Tr. 36.

complaining of increased symptoms following therapy and was progressing towards his goals.
Tr. 434.  At his next two physical therapy sessions, Jury reported a pain level of one on a scale of
zero to ten.  Tr. 437-38 (February 5, 2003); Tr. 445 (February 7, 2003).

On February 6, 2003, Jury met with Dr. Shu Huang for the purpose of seeking a new
physician to handle his worker's compensation claim.  Tr. 441.  Jury complained of persistent
pain in the area of the lateral right forearm with occasional paresthesias of all digits.  Tr. 441.
Dr. Huang encouraged Jury to seek employment since he had multiple employment skills.  Tr.
442.  Dr. Huang noted that Jury's "injury should not affect a lot of what job class he can do."  Tr.
442.  Dr. Huang advised Jury to follow up in one month.  Tr. 443.

On February 12, 2003, Jury reported to the MetroHealth emergency room with
complaints of lower lateral left chest pain near his lowest rib.  Tr. 449-53.  On examination, the
emergency room physicians concluded that Jury's symptoms did not suggest cardiac or
pulmonary disease but his pain was consistent with a rib fracture versus muscle strain.  Tr. 453.
Jury's condition improved and he was discharged.  Tr. 453.

On April 29, 2003, Jury was seen by Jeffrey Schlatt for an occupational therapy
evaluation.  Tr. 216-18, 472-78.  Jury indicated that his goal was to return to work.  Tr. 216.  He
reported a pain level of three on a scale of zero to ten in his right elbow which he described as
burning.  Tr. 216.  Jury reported that he was independent with his bathing and dressing and able
to complete simple household tasks but was unable to perform heavy tasks like snow shoveling
and yard work.  Tr. 217.  Mr. Schlatt assessed Jury with pain, decreased strength and an inability
to perform full work tasks.  Tr. 217.  Mr. Schlatt and Jury agreed on a plan for Jury to attend
occupational therapy sessions three times each week for four weeks.  Tr. 217.  On May 2, 2003,
Jury appeared for a follow-up occupational therapy session.  Tr. 479.  He reported a pain level of

two on a scale of zero to ten but also indicated that his biceps were still burning and noted that he "must have overdone it at the doctor's office." Tr. 479.  Jury participated in 60 minutes of therapeutic exercises, which he tolerated well until he performed bicep curls.  Tr. 479.  Jury fatigued easily.  Tr. 479.  However, with the exception of the bicep curls, he was able to complete the exercises.  Tr. 479.  At his next session on May 5, 2003, Jury reported a pain level of eight on a scale of zero to ten in his left shoulder.  Tr. 482-83.  Jury indicated that he had injured his shoulder while lifting soda pop from the trunk of his car.  Tr. 483.  Because of the shoulder injury, Jury was not able to proceed with his occupational therapy session.  Tr. 483.  At his next session, Jury indicated that he was awaiting an MRI for his left shoulder.  Tr. 485-86.  As a result, Jury's occupational therapy was placed on hold until the shoulder issue was resolved.  Tr. 486.

In July 2003, Jury's EMG showed evidence of cervical radiculopathy and right median neuropathy consistent with carpal tunnel syndrome and possible left median neuropathy.  Tr. 219.  Jury also had an MRI that showed multi-level disease and L C7 foraminal narrowing due to disc and bone spurring.  Tr. 219.

On October 8, 2003, Jeffrey Rosenberg, M.D., saw Jury as a new patient.  Tr. 219-20.  Dr. Rosenberg examined Jury and found that Jury had a decreased range of motion in his neck on both the left and right sides; his flexion was o.k.  Tr. 220.  Jury reported, that in addition to his right biceps tendon rupture which resulted from his 2002 work-related injury, ever since that injury, he had been having persistent neck and upper extremity discomfort.  Tr. 219.  Jury exhibited tenderness from the occipital region to the base of his neck and some tenderness in his right trapezius.  Tr. 220.  His strength was normal and his sensation to touch was normal.  Tr. 220.  With respect to his neck pain, Dr. Rosenberg instructed Jury to continue with over-the-

5

counter Aleve, to take Percocet for severe pain, and to try Flexeril for muscle tightness.  Tr. 220.

On December 31, 2003, Jury saw Dr. Rosenberg with complaints of continued neck pain and

shoulder pain and bilateral hand symptoms.  Tr. 499.  Jury was being seen by Dr. Juan

Hernandez for pain management.  Tr. 499.  Jury indicated that Percocet helped at night and

Naproxen was also helpful.  Tr. 499.  Jury indicated that his worker's compensation claim was

still pending and he wanted to hold off on a referral for his spine until the worker's compensation

claim was resolved.  Tr. 499.

On February 25, 2004, Jury saw Dr. Rosenberg again and reported continued neck pain

and noted that Jury was still awaiting worker's compensation approval for surgery to address the

issues with his neck.  Tr. 505-06.  Dr. Rosenberg also noted that Jury had bilateral arm pain from

his neck injury.  Tr. 506.  Dr. Rosenberg advised Jury to continue with Percocet and to follow up

in three months with labs.  Tr. 506.  During a September 8, 2004, visit with Dr. Rosenberg, Jury

reported that he continued to have neck pain but Percocet was helping.  Tr. 221-22.  Jury noted

that he was having issues with worker's compensation.  Tr. 221.

On May 18, 2004, upon Dr. Juan Hernandez's referral, Jury saw Dr. Michael Eppig, an

orthopedist, for his neck, shoulder, upper back, and arm pain.  Tr. 523.  On examination, Dr.

Eppig found that Jury had good power of the biceps and triceps; full range of motion of the

elbow and shoulder; constantly guarded his neck movement; achieved a maximum of 45 degrees

right and left rotation; had 15 degrees flexion and 15 degrees extension; had no biceps or

brachioradalis jerks; had brisk triceps jerks; had brisk knee jerks; had no ankle jerks; had

negative Hoffman's,[5] no clonus, and Babinski's was normal;[6] had normal manual strength

---

[5] Hoffman reflex or  sign refers to a situation where "a sudden nipping of the nail of the index, middle, or ring finger will produce flexion of the terminal phalanx of the thumb and of the second and third phalanges of some other finger."  *See* Dorland's Illustrated Medical Dictionary, 31st Edition, 2007, at 1737; *see also id.* at 1636.  .

testing on both sides;  Tinel's were negative at the carpal tunnels;[7] complained of tingling and numbness in both thumbs; dexterity was good; pulses were palpable and skin was clear; and low back motion was good.  Tr. 524.  Dr. Eppig noted that Jury's July 2003 EMG and nerve conduction study showed bilateral carpal tunnel and acute denervation of the cervical paraspinals suggestive of radiculopathy.  Tr. 524.  Dr. Eppig also noted that Jury's 2003 MRI showed multiple levels of disc degeneration, herniation, and osteophyte formation.  Tr. 524.  Dr. Eppig advised Jury that "he has a multifactorial issue with both documented bilateral carpal tunnels causing his dysesthesias as well as multiple levels of cervical disc disease."  Tr. 524.  Dr. Eppig cautioned that, even if Jury required surgery, surgery would not be scheduled until Jury completely stopped smoking.  Tr. 524.  To better evaluate Jury's neck, Dr. Eppig advised Jury to have a myelogram and CT scan of his cervical spine.  Tr. 524.  Jury reported being so miserable that he was willing to consider surgical intervention or his spine.  Tr. 524.  However, because of the presence of carpal tunnel syndrome, Dr. Eppig advised Jury to get his carpal tunnel taken care of prior to considering surgical intervention for his neck.  Tr. 524.  The following month, Dr. Rosenberg advised Jury to wear splints for his carpal tunnel syndrome.  Tr. 528-31.

Rodney A. Green. M.D., FACS, a hand surgeon, saw Jury in October 2004 to assess his carpal tunnel syndrome.  Tr. 197-99.  Dr. Green's examination showed a bilateral positive Tinel test; a questionable positive result on the left side for the ulnar nerve; a positive bilateral Phalen's test; and positive elbow flexion test on the right side.  Tr. 199.  Dr. Green also noted that electrical testing confirmed bilateral carpal tunnel syndrome.  Tr. 199.  Following discussions

---

[6] Babinski reflex refers to "dorsiflexion of the big toe on stimulating the sole of the foot; normal in infants but in others a sign of lesion in the central nervous system, particularly in the pyramidal tract."  *See* Dorland's Illustrated Medical Dictionary, 31st Edition, 2007, at 1634.

[7] Tinel sign refers to "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve."  *See* Dorland's Illustrated Medical Dictionary, 31st Edition, 2007, at 1741.

with Jury, on December 8, 2004, Dr. Green performed carpal tunnel release surgery on Jury's right side.  Tr.  199.  Post-operatively, Jury was doing well and making good progress.  Tr. 199. On January 17, 2005, Dr. Green performed carpal tunnel release surgery on Jury's left side.  Tr. 195.  On March 1, 2005,[8] Jury was doing well and reported having good relief of his symptoms.[9] Tr. 200.

Following his carpal tunnel release surgery, on March 29, 2005, Jury returned to Dr. Eppig and indicated that he was still interested in surgery.  Tr. 564.  Dr. Eppig noted that Jury smelled of tobacco and alcohol and advised Jury that, unless he completely stopped smoking, he would not schedule surgery or any further testing.  Tr. 564.  Dr. Eppig advised that, once Jury was tobacco and nicotine free for one month, he would then obtain a myelogram and CT scan for surgical planning purposes.  Tr. 564.

On August 22, 2005, Jury visited a medical care clinic with complaints of groin and testicular pain.  Tr. 572.  Jury reported slipping and doing the splits while carrying laundry up a flight of stairs.  Tr. 572.  He was referred to an orthopedist for follow-up.  Tr. 573.  On August 30, 2005, Jury followed up with Dr. Adam J. Mirarchi, an orthopedic physician.  Tr. 225.  He was advised to seek follow-up treatment for a possible hernia and Dr. Mirarchi noted that Jury did not appear to have an "orthopedic problem."  Tr. 225.

On September 14, 2006, after his date last insured, Jury ultimately underwent the recommended CT scan and myelogram  Tr. 203-05.  On January 14, 2008, Jury underwent an anterior cervical diskectomy C6-C7 with fusion and anterior reflex plate, and structural bone

---

[8] After his January 17, 2005, surgery, Jury had other appointments prior to March 1, 2005, but missed those appointments.  Tr. 200.

[9] Also, during an April 6, 2005, visit with Dr. Rosenberg, Jury reported good results from his carpal tunnel releases. Tr. 567.

graft.  Tr. 257.  In performing the surgery, Dr. Eppig noted that Jury had not had a neurological deficit.  Tr. 257.

### 2.    State agency reviewing physicians

On May 21, 2008, Edmond Gardner, M.D., completed a Physical Residual Functional Capacity Assessment.  Tr. 262-69.  He opined that Jury was able to occasionally lift and/or carry and push and/or pull 20 pounds and frequently lift and/or carry and push and/or pull 10 pounds and he could stand and/or walk and sit for about 6 hours in an 8-hour workday.  Tr. 263.  Dr. Gardner assessed no other limitations.  Tr. 264.  Dr. Gardner noted that Jury's complaints of pain were considered. Tr. 264.

On January 7, 2009, Elizabeth Das, M.D., also completed a Physical Residual Functional Capacity Assessment.  Tr. 327-34.  Like Dr. Gardner, Dr. Das opined that Jury was able to occasionally lift and/or carry and push and/or pull 20 pounds and frequently lift and/or carry and push and/or pull 10 pounds and he could stand and/or walk and sit for about 6 hours in an 8-hour workday.  Tr. 328.  Additionally, she opined that Jury could only occasionally climb ramps, stairs, ladders, ropes and scaffolds and could only occasionally stoop, crouch and crawl.  Tr. 329. She also opined that Jury was limited to frequent bilateral handling (gross manipulation) and fingering (fine manipulation).  Tr. 330.  Dr. Das found Jury's allegations concerning his impairments to be partially credible.  Tr. 332.

### C.    Testimonial Evidence

### 1.    Jury's Testimony

Jury was represented by counsel and testified at the administrative hearing.  Tr. 31, 33-35, 35-.  Following his accident at work, which resulted in an injury to his biceps tendon, Jury experienced pain in his arm and neck.  Tr. 37.  After his biceps healed some, he was still unable

to do physical therapy and could not do anything.  Tr. 37.  As a result, an MRI was taken and revealed problems with his neck.  Tr. 37.

Jury underwent surgery for his carpal tunnel syndrome ("CTS") in late 2004 and early 2005.  Tr. 37-38.  Notwithstanding his CTS surgeries, Jury stated that he is still unable to grip anything, has numbness through his wrist and into his thumbs, and his hands swell up.  Tr. 37-38.  Jury needs assistance cutting his food because the knife slips right out his hand.  Tr. 38.  Per Jury, his doctor has indicated that his grip and other issues with his hands are related to his nerves being pinched in his neck and, in 2010, his doctor recommended that Jury undergo an additional surgery to alleviate issues with his neck.[10]  Tr. 38-41.

Jury has a driver's license but does not drive very often.  Tr. 41-42.  He only drives a car when he is unable to get somewhere using public transportation.  Tr. 41-42.  There are four steps to climb at the front of his home but, within his house, there are no stairs to navigate.  Tr. 42.  He has not been prescribed a cane.  Tr. 42.  Other than watching television, Jury does not do much during the day.  Tr. 42.  He is unable to stand for very long.  Tr. 42.  He can walk only about 200 feet, which is about two houses down the street.  Tr. 42-43.  After walking the short distance, he has to sit down because his lower back goes numb and he experiences burning with lots of pain shooting down into his legs.  Tr. 43.  In 2004-2005, Jury could only walk about 50 feet; his ability to walk then was worse than at the time of the hearing.  Tr. 47.   Jury indicated that he really does not see anyone for his pain because he has no insurance and worker's compensation has not covered the claim.  Tr. 43-44.  His internal medicine doctor will occasionally prescribe pain medicine for him but not very often because he does not want Jury to become addicted to

---

[10] Jury indicated that he had one surgery, which made his problems worse, so he was nervous about having another surgery, and was planning to seek another opinion.  Tr. 40.

the pain medication.  Tr. 44.  In addition to pain medication, Jury takes blood pressure medication and sleeping pills.  Tr. 44.  He previously took medication for depression.  Tr. 44-45.

During 2004-2005, Jury indicated that he had pain in his neck on a daily basis, with his pain level being between a five and seven on a scale of zero to ten.  Tr. 45-46.  He had to lie down to relieve the pain in his neck.  Tr. 48. He had a special pillow to support his neck and a soft collar neck brace.  Tr. 48.  Jury also indicated that it has been difficult to tell which symptoms are related to his neck issues and which symptoms are related to his carpal tunnel.  Tr. 46.  When he uses his arms, Jury's neck pain increases; his arms go numb, he gets really bad tingling, and he cannot grip anything.  Tr. 49.

### 2.    Vocational Expert's Testimony

 Vocational Expert Gene Burkhammer ("VE") testified at the hearing.  Tr. 49-56.   The VE described Jury's past work, which included work as a welder/fabricator (medium, SVP-6 position); production or spot welder (medium, SVP-2 position); welder/pipe fitter (heavy, SVP-7); and construction laborer (very heavy, SVP-2).[11]  Tr. 50.  The VE testified that there would be no skills from Jury's past work transferrable to light or sedentary-duty jobs.  Tr. 54.

The ALJ asked the VE to assume an individual of the same age, education and work experience as Jury with the following limitations: able to lift up to 20 pounds occasionally and lift and carry up to 10 pounds frequently; and stand and walk for about 6 hours in an 8-hour workday and sit for up to 6 hours in an 8-hour workday with normal breaks.  Tr. 51.  The VE indicated that such an individual would be unable to perform Jury's past work because his past work was all medium, heavy, or very heavy and the hypothetical described light work.  Tr. 51.

---

[11] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

The VE indicated that there would be other jobs available in the national or regional economy that such a hypothetical individual could perform, including mail clerk (light, SVP-2, with 900 jobs locally, 8,000 jobs statewide, and 160,000 jobs nationally); fast food worker (light, SVP-2, with 12,000 jobs locally, 80,000 statewide, and 2 million nationally); and housekeeping cleaner (light, SVP-2, with 2,000 jobs locally, 20,000 jobs statewide, and 500,000 jobs nationally).  TR. 51-52.

The ALJ then added that the above described individual would also be precluded from climbing ladders, ropes or scaffolds; could only occasionally balance, stoop, kneel, crouch; could never crawl; could do no more than occasional bilateral gross manipulation; and needs to avoid concentrated exposure to unprotected heights.  Tr. 52.  The VE testified that the three jobs noted for the first hypothetical would be eliminated because of the limitation of no more than occasional gross manipulation.  Tr. 52.  The VE also added that the limitation of no more than occasional gross manipulation would eliminate most jobs in the economy.  Tr. 52.

As a third hypothetical, the ALJ asked the VE to assume no more than frequent bilateral gross manipulation.  Tr. 52.  In response, the VE indicated that the three jobs noted for the first hypothetical would be available along with other jobs.  Tr. 52.  The VE also indicated that his testimony would not change if the individual was further limited in his ability to understand, remember, and carry out simple instructions (fourth hypothetical).  Tr. 52.  Jury's counsel asked the VE whether his opinion in response to the third hypothetical would change if, in addition to being limited to no more than frequent gross manipulation, the hypothetical individual was precluded from overhead activities.  Tr. 54.  In response, the VE testified that the same jobs would remain available to the individual because the jobs mentioned by the VE do not really involve overhead reaching.  Tr. 54.

As a fifth hypothetical, the ALJ added a sit/stand option with the individual not being off-task for more than 10% of the work period. Tr. 53. The VE stated that Jury's past relevant work would remain unavailable to such an individual. Tr. 53. However, there would be sedentary jobs available with a sit/stand option, including addresser (sedentary, SVP-2, with 800 jobs locally, 6,000 jobs statewide, and 160,000 jobs nationally); charge account clerk (sedentary, SVP-2, with 400 jobs locally, 3,000 jobs statewide, and 90,000 jobs nationally); and food/beverage order clerk (sedentary, SVP-2, with 300 jobs locally, 4,000 jobs statewide, and 90,000 jobs nationally). Tr. 53. The VE also indicated that, if the individual described in the last hypothetical was so impaired because of pain that he was off-task for 20% or more of the day, there would be no jobs available. Tr. 53-54.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[12] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his September 29, 2010, decision, the ALJ made the following findings:

1.  Jury's date last insured was December 31, 2005.  Tr. 16.

---

[12] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

2.    Jury did not engage in substantial gainful activity during the period from his alleged onset date of August 15, 2002, through his date last insured. Tr. 16.

3.    Jury had the following severe impairments through his date last insured: status post repaired biceps tendon; degenerative disc disease and osteoarthritis of the cervical spine with herniated discs and radiculopathy; obesity; anxiety; and carpal tunnel syndrome status post successful releases.  Tr. 16-17.  High blood pressure, reflux esophagitis, and hyperlipidemia were non-severe impairments. Tr. 17.  Hearing loss, liver and abdominal problems, and anemia were not medically determinable impairments and/or were not problems that existed prior to Jury's date last insured.  Tr. 18.

4.    Through the date last insured, Jury did not have an impairment or combination of impairments that met or medically equaled a Listing.  Tr. 19.

5.    Through the date last insured, Jury had the residual functional capacity ("RFC") to perform light work except with no overhead reaching; no more than frequent handling bilaterally; needs to avoid concentrated exposure to unprotected heights; limited in his ability to understand, remember and carry out simple instructions, to make judgments on simple work-related decisions, to interact appropriately with the general public, supervisors, and co-workers in a routine work setting, and to respond to usual work situations and to changes in a routine work setting. Tr. 19-22.

6.    Through the date last insured, Jury was unable to perform any past relevant work.  Tr. 22-23.

7.    Jury was born on January 27, 1964, and was 41 years old, which is defined as a younger individual age 18-49, on the date last insured.  Tr. 23.

8.    Jury has at least a high school education, a graduate equivalency degree [sic],[13] and is able to communicate in English.  Tr. 23.

9.    Transferability of job skills is not material to the determination of disability.  Tr. 23.

10.   Through the date last insured, considering Jury's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Jury could have performed.  Tr. 23-24.

---

[13] It is likely the ALJ intended to reference a General Educational Development ("GED") certificate.

Based on the foregoing, the ALJ determined that Jury had not been under a disability from August 15, 2002, the alleged onset date, through December 31, 2005, the date last insured. Tr. 24.

## V. Parties' Arguments

### A.    Plaintiff's Arguments

Jury's arguments for reversal are twofold. First, Jury asserts that the ALJ erred at Step Three when he failed to conclude that Jury's neck impairments or carpal tunnel syndrome met or equaled Listing 1.04A[14] and Listing 11.08.[15] Doc. 17, pp. 11-15. Second, Jury asserts that the ALJ did not conduct a proper credibility analysis and erred in evaluating Jury's complaints of pain. Doc. 17, pp. 15-18.

### B.    Defendant's Arguments

In response, the Commissioner argues that the ALJ's determination that Jury did not have an impairment or combination of impairments that met or medically equaled a Listing is supported by substantial evidence. Doc. 18, pp. 10-17. Defendant asserts that Jury did not satisfy all of the requirements of Listing 1.04A at any time, let alone for 12 months during the relevant period (August 15, 2002, the alleged disability onset date, through December 31, 2005, the date last insured). Doc. 18, pp. 11-14. Defendant also asserts that Jury did not satisfy a Listing in connection with his carpal tunnel syndrome. Doc. 18, pp. 14-17. Finally, Defendant argues that the ALJ's credibility assessment was proper and is supported by substantial evidence. Doc. 18, pp. 17-19.

---

[14] Listing 1.04A relates to disorders of the spine. 20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 1.04A.

[15] Listing 11.08 relates to spinal cord or nerve root lesions due to any cause with disorganization of motor function as described in Listing 11.04B, which describes a central nervous system vascular accident, with significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.0C) for more than 3 months post-vascular accident. 20 C.F.R. pt. 404, Subpt. P, App. 1, Listings 11.08 and 11.04B.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A.    The ALJ's Step Three analysis is insufficient.

Jury argues that the ALJ erred in concluding that his impairments did not meet or equal a Listing because the ALJ's Step Three analysis misread the requirements of Listing 1.04A as well as the record and also failed to mention or discuss Jury's carpal tunnel syndrome in relation to the Listings.  Doc. 17, pp. 12-15.

The ALJ's entire Step Three analysis is contained in a single, two-sentence paragraph, the first sentence of which describes Listing 1.04A and the second sentence of which states why the ALJ concluded that Jury's impairment did not satisfy that Listing.  The ALJ stated:

> Listing 1.04A, which relates to disorders of the spine such as herniated nucleus pulposus, osteoarthritis, degenerative disc disease, and facet arthritis, requires evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss. While the claimant had evidence of nerve root compression of the cervical spine and some weakness in the upper extremities, he had no atrophy, no sensory or reflex loss in any upper extremity and had affective [sic] ambulation prior to the date he was last insured.

17

Tr. 19 (emphasis supplied).

The ALJ's Step Three analysis is slightly more than a bare conclusion.  However, it falls short of satisfying the Commissioner's duty to make clear the reason or reasons for the disability determination.  42 U.S.C. § 405(b)(1).  Under the Social Security Act,

> The Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this title [42 USCS §§ 401 et seq.]. Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based . . .

42 U.S.C. § 405(b)(1).

Under this statute, the ALJ is "required to discuss the evidence and explain why he found that appellant was not disabled at step three."  *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).  A claimant who is found to have an impairment that meets or medically equals a Listing at Step Three is entitled to benefits regardless of an ALJ's conclusions at Steps Four or Five.  *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 416 (6th Cir. April 1, 2011).  Without an evaluation of the evidence, comparison of that evidence to the Listings and an explained conclusion, meaningful judicial review cannot occur; "it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence."  *Id.* (*citing Clifton*, 79 F.3d 1007, 1009).  That is why the Sixth Circuit found, in *Reynolds,* that an ALJ's failure to analyze a claimant's physical condition in relation to the Listed Impairments was not harmless error. *Id.; see also May v. Astrue*, 2011 U.S. Dist. LEXIS 88551, *24-25 (N.D. Ohio June 1, 2011).

**Listing 1.04A (Disorders of the Spine).**  Jury asserts that Listing 1.04A requires a finding of motor loss which can be met with a showing of <u>either</u> "atrophy with associated muscle weakness" <u>or</u> "muscle weakness."  Doc. 17, p. 12.  Thus, Jury argues that the ALJ's reliance on

his finding that there was no evidence of "atrophy" was misplaced.  Doc. 17, p. 12.  Further, Jury asserts that, although atrophy is not required, there was in fact evidence of atrophy.  Doc. 17, pp. 12-13.  Jury also argues that the ALJ misread Listing 1.04A because, while that Listing does not require an inability to ambulate, the ALJ relied on his finding that Jury could effectively ambulate as part of his rationale for concluding that Jury did not meet the Listing.  Doc. 17, p. 13-14.  Defendant agrees with Jury that Listing 1.04A, by its plain language, requires neither atrophy nor a loss of ability to ambulate.  Doc. 18, p. 13.  However, Defendant argues that both are nevertheless relevant in determining whether Listing 1.04A has been met.  Doc. 18, pp. 13-14.  Further, Defendant argues that Jury cannot demonstrate that his spine impairment or carpal tunnel satisfies a Listing and the ALJ's Step Three findings are supported by substantial evidence.  Doc. 18, pp. 11-17.

While the burden of proof rests with the claimant at Steps One through Four,[16] in this case the Court cannot effectively evaluate whether the ALJ's Step Three decision is supported by substantial evidence because the ALJ did not sufficiently explain his analysis.  *See Reynolds*, 424 Fed. Appx. at 416.  For example, Listing 1.04A describes motor loss as "atrophy with associated muscle weakness *or* muscle weakness."  20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 1.04A (emphasis supplied).  This description in the Listing indicates that a claimant may satisfy Listing 1.04A even without a showing of atrophy if the claimant can demonstrate muscle weakness.  The ALJ failed to recognize this when he relied in part on his finding that Jury had no atrophy in concluding that Jury's spine impairment did not meet Listing 1.04A.  Tr. 19.  Moreover, as noted by Jury, his medical records do in fact provide some evidence of atrophy.  Doc. 17, pp. 12-13.[17]

---

[16] *Walters*, 127 F.3d at 529.

[17] For example, during a January 30, 2003, physical therapy visit, it was noted that Jury had "decreased tone and girth right biceps versus left."  Tr. 426.

Accordingly, even if atrophy was a necessary element of Listing 1.04A or was relevant to the determination, the ALJ's Step Three analysis was deficient to a degree that prevents this Court from being able to assess whether it is supported by substantial evidence.

The ALJ's conclusion within his Step Three analysis that Jury "had affective [sic] ambulation prior to the date he was last insured" provides a second example of the insufficiency of that analysis.  Since an inability to ambulate is not a specific requirement under Listing 1.04A,[18] it is unclear, in the absence of additional explanation, how this finding related to the ALJ's Step Three determination.[19]

Another example of the insufficiency of the ALJ's Step Three analysis is the ALJ's finding that Jury had no sensory or reflex loss in any upper extremity.  Tr. 19.  This finding appears to be inconsistent with treatment records that suggest some reflex loss.[20] On May 18, 2004, Dr. Eppig noted that Jury had no biceps or brachioradialis[21] jerks on either side.  Tr. 524.  Also, as noted by the ALJ, during an October 8, 2003, visit with Dr. Rosenberg, while reflexes were normal at the biceps, reflexes could not be elicited at the triceps.  Tr. 21 (referencing Exhibit 3F, p. 14 (Tr. 220)).

The Commissioner argues that, even if Jury's interpretation of the medical records is correct, there is no documentation of "coextensive 'motor loss (atrophy with associated muscle weakness or muscle weakness)' and 'sensory of reflex loss.'"  Doc. 18, pp. 12-13 (emphasis in original).  Thus, Defendant asserts that Jury does not meet Listing 1.04A.  Doc. 18, pp. 12-13.

---

[18] 20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 1.04A.

[19] This is so even if, as argued by Defendant, the ability to ambulate may be relevant.

[20] Plaintiff also points to treatment records that report complaints of parasthesias of all digits (Tr. 441) and tingling in both hands (Tr. 219) as evidence to support a finding of sensory loss.  Doc. 17, p. 13.

[21] A "brachioradialis reflex" is where "tapping on the lower end of the radius produces flexion of the forearm."  *See* Dorland's Illustrated Medical Dictionary, 31st Edition, 2007, at 1634.

However, the ALJ did not provide this rationale as a basis for his conclusions. Accordingly, the Commissioner's arguments in this regard amount to *post hoc rationalization*. *May v. Astrue*, 2011 WL 3490186, * 9 (N.D. Ohio, Jun. 1, 2011), *report and recommendation adopted*, 2011 WL 3490229 (N.D. Ohio, Aug. 10, 2011) (indicating that "it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration.") (internal citations omitted).

**Carpal Tunnel Syndrome.** The ALJ's Step Three analysis is also insufficient with respect to Jury's carpal tunnel syndrome. In July 2003, Jury's EMG showed evidence of cervical radiculopathy and right median neuropathy consistent with carpal tunnel syndrome and possible left median neuropathy. Tr. 219. Jury's carpal tunnel release surgeries occurred in December of 2004 and January of 2005. Tr. 195, 199. Although the ALJ recognized Jury's carpal tunnel syndrome (status post successful release) as a severe impairment, and even though records suggest evidence of carpal tunnel syndrome more than 12 months prior to the successful release surgeries, the ALJ made no mention of Jury's carpal tunnel syndrome in his Step Three analysis. Tr. 16, 19.

While harmless error has been relied upon to uphold Step Three findings notwithstanding an insufficient analysis, harmless error is applied cautiously in administrative review settings. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005) (finding that *Clifton* did not categorically reject the application of harmless error analysis in the context of a step three finding); *Hufstetler v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 64298, *27 (N.D. Ohio June 17, 2011) (citing *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004)).

Application of the doctrine of harmless error may be appropriate where a review of material that the ALJ did consider leads to the conclusion that no reasonable fact finder,

following the correct procedure, could have resolved the factual matter in another manner. *Hufstetler*, 2011 U.S. Dist. LEXIS at 26-27 (finding that the ALJ's lack of a full discussion at Step Three was harmless error because the ALJ's findings at Step Four provided sufficient information for the Court to determine that no reasonable administrative fact finder would have resolved the matter differently). Defendant asserts that, even though the ALJ did not directly address Jury's carpal tunnel syndrome within his Step Three analysis, the ALJ discussed Jury's carpal tunnel elsewhere in the decision. Doc. 18, p. 15. Although the ALJ discussed Jury's carpal tunnel syndrome in his RFC analysis (Tr. 21-22), the ALJ's focus there was mainly on the positive results from his carpal tunnel syndrome surgeries. Thus, without any mention of carpal tunnel syndrome at Step Three, or a clear indication in the decision that the ALJ did in fact consider whether Jury's carpal tunnel syndrome alone, or in combination with other impairments, met or equaled a Listing, the Court is left to speculate as to whether the ALJ gave any consideration at all to Jury's carpal tunnel syndrome in relation to the Listings or, if he did, which Listing or Listings the ALJ considered. Plaintiff and Defendant each point to a different Listing as being the correct Listing under which carpal tunnel syndrome is to be evaluated. Plaintiff argues that carpal tunnel syndrome is evaluated under Listings 11.08 and 11.04B. Doc. 17, pp. 14-15. In contrast, Defendant argues that carpal tunnel syndrome is evaluated under Listings 11.14 and 11.04B. Doc. 18, p. 16, n. 10. This disagreement about which Listing should be used to evaluate carpal tunnel syndrome further highlights how the ALJ's failure to discuss Jury's carpal tunnel at all in his Step Three analysis precludes the Court from conducting a meaningful review of the Commissioner's finding of no disability.

The Commissioner's attempt to demonstrate why Jury's impairments, including carpal tunnel syndrome, do not meet a Listing amounts to *post hoc rationalization* since the ALJ did not

provide that reasoning.  *May*, 2011 WL 3490186 at * 9.  Thus, for the reasons set forth herein, the ALJ's Step Three analysis falls short and application of harmless error is not warranted.  A full review and analysis after remand may not result in a disability finding at Step Three.  However, without a more thorough analysis at Step Three, such a possibility cannot be ruled out definitively.  Accordingly, reversal and remand is warranted to allow for a more complete evaluation of the evidence, comparison of that evidence to the Listings, and an explained conclusion under Step Three consistent with 42 U.S.C. § 405(b)(1).

**B.**    **Credibility analysis.**

Since further analysis under Step Three may impact or eliminate the need for subsequent steps in the sequential evaluation process, the Court declines to address Plaintiff's assertion that the ALJ erred in his credibility analysis.  *See Trent v. Astrue*, 2011 WL 841538, * 7 (N.D. Ohio Mar. 8, 2011) (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, subsequent steps in the sequential evaluation process might be impacted).

### VII. Conclusion and Recommendation

For the foregoing reasons, the Court **REVERSES** the Commissioner's decision and **REMANDS** this case for further proceedings consistent with this opinion.

Dated:  August 14, 2013

_____
Kathleen B. Burke
United States Magistrate Judge